IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| AMY BALDIN, an individual and as sole manager of LUGANO PROPERTIES 4, LLC, a Nevada Limited Liability Company, | 3:12-cv-648-AC |
| | FINDINGS AND RECOMMENDATION |
| Plaintiff, | |
| v. | |
| WELLS FARGO BANK, N.A., a National Bank registered to do business in Oregon; and WELLS FARGO HOME MORTGAGE, a division of WELLS FARGO BANK, N.A., | |
| Defendants. | |

ACOSTA, Magistrate Judge:

*Pending Motions*

Amy Baldin ("Baldin") filed a Fourth Amended Complaint ("FAC") against Wells Fargo

Bank, N.A., and Wells Fargo Home Mortgage (collectively "Wells Fargo" of "Bank"), alleging a

single claim for defamation under state law arising from information provided by Wells Fargo to

1 - FINDINGS AND RECOMMENDATION

various credit reporting agencies ("CRAs") about Baldin's payment history on several mortgage loans. Baldin seeks monetary and injunctive relief, including attorney fees and costs, and an accounting from Wells Fargo of all monies she owes to Wells Fargo.

Wells Fargo filed a Motion for Summary Judgment seeking an entry of judgment against Baldin on her defamation claim. Additionally, Wells Fargo moves for summary judgment on its counterclaim for costs, expenses and fees incurred in defending this action. For the reasons that follow, Wells Fargo's Motion for Summary Judgment should be granted.

*Factual Background*

Baldin and her former husband, Jeffery Schoeffner, acquired several properties between 2006 and 2009. In order to finance the purchase of their various properties, Baldin and Schoeffner obtained loans from Wells Fargo, securing those loans with trust deeds on each property. (Fourth Am. Compl. ¶¶ 2–14.) Three of those six loans are relevant to Baldin's defamation claim. (Fourth Am. Compl. ¶¶ 52, 58, 59 (describing alleged wrongful acts among the loans secured by the Multnomah, Cervantes, and Miami properties).)

The first Wells Fargo loan obtained by Baldin and Schoeffner closed on or about September 27, 2006, and was secured by a deed of trust on the property located at 2410 NE Multnomah Street, Portland, Oregon 97232 ("Multnomah Property"). (Fourth Am. Compl. ¶ 5.) The second loan closed on or about June 12, 2007, and was secured by a deed of trust on the property located at 1500 Bay Road, Miami Beach, Florida ("Miami Property"). (Fourth Am. Compl. ¶ 14.) The third loan closed on or about December 28, 2007, and was secured by a deed of trust on the property located at 288-294 Cervantes Circle, Lake Oswego, Oregon 97035 ("Cervantes Property"). (Fourth Am. Compl. ¶ 3.) An escrow account was not required for the loans. Rather, in lieu of an escrow

account, Baldin and Schoeffner elected to manage the payment of taxes and insurance themselves. (Brian T. Kiolbasa Decl. Ex. 1 (Amy Baldin Dep. 91:19-92:12, Sept. 24, 2014 (hereinafter "Baldin Dep.")); Baldin Dep. Ex. 11, 19, Nov. 14, 2014.)

In January 2010, several years after obtaining the loans, Baldin and Schoeffner transferred the Multnomah Property and the Cervantes Property into separate LLCs, which combined with other LLCs that housed other investment properties, to form a Nevada Series LLC. (Fourth Am. Compl. ¶¶ 4, 6.) The Nevada Series LLC formed the corpus of an irrevocable trust. (Fourth Am. Compl. ¶¶ 4, 6.)

Baldin and Schoeffner divorced shortly after the Multnomah and the Cervantes properties were transferred to the various LLCs. (Fourth Am. Compl. ¶ 15.) Pursuant to the terms of their divorce, Baldin assumed the responsibility to make all mortgage and tax payments for the properties they had jointly acquired. (Fourth Am. Compl. ¶ 15.) In late 2010, Baldin failed to pay the property tax payments for the Multnomah, Cervantes and Miami properties when due.[1] Previously in this litigation, Baldin explained that "[d]ue to the stress of [her] divorce, [she] overlooked the due date of the property tax payments for the Multnomah and Cervantes Properties." (*See* Compl. (ECF No. 1) at ¶ 18; First Am. Compl. (ECF No. 4) at ¶ 19; Second Am. Compl. (ECF No. 81) at ¶ 26.) Baldin admits the tax payments were not made until September 2011. (Baldin Dep. 89:7-12.)

---

[1] In Oregon, "the first one-third of all taxes and other charges due from the taxpayer or property . . . shall be paid on or before November 15, the second one-third on or before February 15, and the remaining one-third on or before May 15 next following." OR. REV. STAT. § 311.505(1). These same timelines were in effect in 2010 and 2011.

In Florida, "All taxes shall be due and payable on November 1 of each year or as soon thereafter as the certified tax roll is received by the tax collector." FLA. STAT. § 197.333. The same deadline was in effect in 2010 and 2011.

In mid-2011, the Multnomah County Assessor notified Wells Fargo that Baldin failed to pay her property taxes for the Multnomah and the Cervantes properties. (Andrea Kruse Decl. ¶¶ 7-8, Nov. 13, 2014.) Under Oregon law, the taxes for the Multnomah and Cervantes properties were considered delinquent on May 15, 2011.[2] Similarly, in 2011, Wells Fargo learned Baldin failed to pay her property taxes for the Miami Property. (Kruse Decl. ¶ 22.) Under Florida law, the Miami Property taxes were considered delinquent on April 1, 2011, and became subject to advertisement and sale on June 1, 2011.[3] After learning of the delinquent taxes, Wells Fargo repeatedly provided notices to Baldin and Schoeffner in an attempt to have the borrowers satisfy their tax obligations.

On July 11, 2011, Wells Fargo sent letters to Baldin and Schoeffner requesting that no later than August 10, 2011, they provide proof the property tax payments had been made for the Multnomah and the Cervantes properties. (Kruse Decl. ¶ 8; Exs. 5, 6.) The letters cautioned that if proof of payment was not provided, Wells Fargo would establish escrow accounts to pay the past due and future property tax payments. (Kruse Decl. Exs. 5, 6.) Wells Fargo did not receive the proof of payment it requested for either property by August 10, 2011. (Kruse Decl. ¶ 9.)

On August 10, 2011, Wells Fargo sent a second round of letters to Baldin and Schoeffner, repeating its request for proof the property tax payments had been made for the Multnomah and Cervantes properties, and requesting the borrowers' response no later than August 30. (Kruse Decl. ¶ 10; Exs. 7, 8.) Wells Fargo did not receive the proof of payment it requested for either property

---

[2] In Oregon, taxes on real property that are not paid on or before May 15 become delinquent. OR. REV. STAT. § 311.510. The same timelines were in effect in 2010 and 2011.

[3] In Florida, taxes on real property that are not paid on or before April 1 become delinquent. FLA. STAT. § 197.333. If unpaid on June 1, the tax collector is required to advertise the delinquent taxes and sell tax certificates for the unpaid taxes. *Id.* at § 197.402(3). The same timelines and provisions were in effect in 2010 and 2011.

4 - FINDINGS AND RECOMMENDATION

by August 30, 2011. (Kruse Decl. ¶ 11.)  As a result of the borrowers' failure to pay property taxes when due, Wells Fargo established escrow accounts for both the Multnomah and the Cervantes properties, and advanced funds to Multnomah County for the payment of the delinquent property taxes. (Kruse Decl. ¶ 12.)

On September 21, 2011, Wells Fargo sent letters to Baldin and Schoeffner advising that escrow accounts had been established for the Multnomah and Cervantes properties, and that property tax payments had been advanced on their behalf. (Kruse Decl. ¶ 13; Exs. 9, 10.) Approximately one week later, on September 27, 2011, Wells Fargo sent escrow account disclosure statements to the borrowers, advising them that due to the establishment of escrow accounts on the loans, the borrowers' monthly payments on the Multnomah and the Cervantes properties would be increasing beginning with the payment due December 1, 2011.  (Kruse Decl. ¶ 14; Exs. 11, 12.)

Similar to its actions taken on the Multnomah and Cervantes properties, on August 24, 2011, Wells Fargo sent a letter to Baldin and Schoeffner requesting that no later than September 23, they provide proof the property tax payments were made for the Miami Property.  (Kruse Decl. ¶ 23; Ex. 15.)  The letter cautioned that if proof of payment was not provided, Wells Fargo would establish an escrow account to pay the past due and future property tax payments.  (Kruse Decl. Ex. 15.) Wells Fargo did not receive the proof of payment as requested for the Miami Property by September 23, 2011.  (Kruse Decl. ¶ 24.)

Accordingly, Wells Fargo sent a second letter to Baldin and Schoeffner on September 23, 2011, repeating its request for proof the property tax payments had been made for the Miami Property, and requesting the borrowers respond no later than October 13, 2011.  (Kruse Decl. ¶ 25; Ex. 16.)  Wells Fargo did not receive the proof of payment it had requested by October 13, 2011.

(Kruse Decl. ¶ 26.) As a result of the borrowers' failure to pay property taxes when due, Wells Fargo established an escrow account for the Miami Property, and advanced funds to Dade County for the payment of the delinquent property taxes. (Kruse Decl. ¶ 27.)

On October 17, 2011, Wells Fargo sent a letter to Baldin and Schoeffner advising that an escrow account had been established for the Miami Property, and that property tax payments had been advanced on their behalf. (Kruse Decl. ¶ 28; Ex. 17.) Approximately one week later, on October 25, 2011, Wells Fargo sent an escrow account disclosure statement to the borrowers advising that due to the establishment of an escrow account on the loan, the borrowers' monthly payments on the Miami Property would be increasing beginning with the payment due on January 1, 2012. (Kruse Decl. ¶ 29; Ex. 18.)

Baldin contends she never received the July and August letters from Wells Fargo regarding the tax deficiencies (Baldin Decl. ¶ 3 and Exhibits cited therein; Baldin Dep. 74:11-74:19, 79:9-80:4.) Baldin admits she "was late in paying the 2010-2011 property taxes to Multnomah County for both the Cervantes and Multnomah Properties." (Amy Baldin Decl. ¶ 2, Dec. 5, 2014.) Upon receipt of the delinquent notice from Multnomah County, however, Baldin "immediately made payment of the amounts due including late fees . . . ." (Baldin Decl. ¶ 2.) In addition, Baldin insists she called Wells Fargo's customer service to inform them of her tax payment, and she furnished proof of payment to Wells Fargo by way of a letter sent via facsimile on September 5, 2011. (Baldin Decl. ¶ 2; Exs. 3, 4.) Wells Fargo, however, disputes Baldin's contention regarding proof of her tax payments for the Multnomah and Cervantes properties. According to Wells Fargo, Baldin did not provide proof to Wells Fargo until at least mid-October 2011, and she faxed the confirmation to an incorrect number. (Baldin Dep. 84:19-91:10; Baldin Dep. Ex. 10.)

6 - FINDINGS AND RECOMMENDATION

Baldin charges that despite her paying the property taxes on September 5, 2011, and immediately notifying Wells Fargo of the payment, more than two weeks later the Bank proceeded to pay the taxes and establish the escrow accounts. (Baldin Decl. ¶ 4; Exs. 8-10.) Upon receipt of letters from Wells Fargo informing her it had paid the property taxes and opened the escrow accounts, Baldin contacted the Bank and "demanded that the Bank disband the escrow accounts." (Baldin Decl. ¶ 5, Exs. 11, 12.) Baldin states in her Declaration that "the Bank's representative admitted [] there was a double payment to the County and the property taxes were paid in error . . . ." (Baldin Decl. ¶ 5; Ex. 13.) Nevertheless, Wells Fargo declined to dissolve the escrow accounts or adjust the amount owed to reflect Baldin's tax payment. (Baldin Decl. ¶ 5.)

Despite being advised by Wells Fargo the new escrow accounts would cause her monthly payments to increase, Baldin continued to make payments reflecting only the principal and interest sums. Specifically, Baldin made monthly payments of $1,999.09 on the Multnomah Property from December 2011 through April 2012, although additional sums were required each month to cover the escrow expenses. (Kruse Decl. ¶ 15; Ex. 11.) Likewise, Baldin made monthly payments of $3,069.44 on the Cervantes Property in December 2011 and January 2012, although greater sums were required each month because of the newly escrowed status of the loan. (Kruse Decl. ¶ 17; Ex. 12.) Baldin made monthly payments of principal and interest only of $2,404.95 for the Miami Property in January and February 2012, and an additional partial payment later in February, but no other payments were received. (Kruse Decl. ¶ 30; Ex. 18.)

At approximately the same time that Wells Fargo was investigating the borrowers' delinquent property taxes, Wells Fargo learned the Cervantes Property had been transferred from the borrowers to LUGANO PROPERTIES 4, LLC, a Nevada Series LLC, in violation of the parties' loan

7 - FINDINGS AND RECOMMENDATION

agreement.  As a result of the non-consented transfer of the Cervantes Property, Wells Fargo declared the loan in default, accelerated the loan, and exercised the due-on-sale clause in the trust deed. (Fourth Am. Compl. ¶ 29.)

In accordance with the loan acceleration, on February 3, 2012, Baldin received a 30-day notice of default on the Cervantes Property. One week later, Wells Fargo declined to accept Baldin's timely tendered mortgage payment for the loan on the Cervantes Property.  (Baldin Decl. ¶ 6.) According to Baldin, on February 29, 2012, Wells Fargo's agent, Northwest Trustee Services "claimed" that at Wells Fargo's direction, it started the foreclosure process on the Cervantes Property even though the 30-day payoff period had not expired. (Baldin Decl. ¶ 6; Ex. 14.)

Baldin was unable to pay the balance due on the Cervantes Property following the acceleration of the loan in February 2012. (Kruse Decl. ¶ 19.) As a result, Wells Fargo reported the Cervantes Property loan as thirty days past due in March 2012, which is the first time the Cervantes loan was reported late. (Kruse Decl. ¶ 20.) Wells Fargo did not receive any payments on the Miami Property after February 2012. (Kruse Decl. ¶ 30.)  As a result, Wells Fargo reported the Miami Property loan as thirty days past due in April 2012, which was the first time the Miami Property was reported late. (Kruse Decl. ¶ 31.) Wells Fargo did not receive any payments on the Multnomah Property after April 2012, at which point the loan remained due for the payment owed April 2012. (Kruse Decl. ¶ 15.) As a result, Wells Fargo reported the Multnomah Property loan as thirty days past due in May 2012, which was the first time the Multnomah Property was reported late. (Kruse Decl. ¶ 16.)

Baldin states Wells Fargo immediately reported to the CRAs that her payments were delinquent, thereby damaging her credit score. (Baldin Decl. ¶ 9; Ex. 15.) Baldin challenges the

Bank's characterization to the CRAs that she did not make her mortgage payments when, in fact, it was Wells Fargo that refused to accept and/or credit the payments. Baldin represents her credit score prior to the negative reporting was well over 700, but fell "precipitously when the Bank began to target" her. (Baldin Decl. ¶ 9.)

Baldin admits she quit paying the Multnomah Property and Miami Property loans because she disputed Wells Fargo's treatments of the payments she was making. Wells Fargo asserts Baldin was required to make payments of principal, interest, and escrow on all three loans, she continued to make payments of only the principal and interest sums. (Baldin Dep. 105:14-106:19.) By May 2012, Baldin ceased making payments on all of the loans, and Wells Fargo was reporting each of them past due.

Baldin initiated this lawsuit by filing a Complaint in Multnomah County Circuit Court on March 7, 2012, which Wells Fargo later removed to this Court on April 12, 2012. Baldin states she filed a lawsuit against Wells Fargo in state court because she feared her investment in the Cervantes Property could be lost in a foreclosure. (Baldin Decl. ¶ 8.) After Baldin initiated the state court action, in a letter dated March 14, 2012, Wells Fargo reversed its acceptance of Baldin's most recent payments on the mortgage for the Multnomah Property. (Baldin Decl. ¶ 8.) Although, initially, the Bank accepted and credited the March mortgage payment on the Multnomah Property, it reversed that transaction and, instead, transferred those funds to an "unapplied funds account." (Baldin Decl. ¶ 8.) Moreover, Well Fargo treated the mortgage as unpaid and added approximately $1,350 in monthly fees to that mortgage payment. (Baldin Decl. ¶ 8.) To date, Wells Fargo has not declared the loan on the Multnomah Property to be in default, nor has it given notice of an intent to accelerate

9 - FINDINGS AND RECOMMENDATION

that loan. (Baldin Decl. ¶ 8.) Likewise, the Bank has not declared the loan on the Miami Property to be in default, nor has it given notice of an intent to accelerate that loan. (Baldin Dec. ¶ 8.)

The initial Complaint did not include any allegations regarding negative credit reporting, but instead challenged Wells Fargo's acceleration of the Cervantes Property loan and the imposition of an escrow account. (*See generally*, Compl. (ECF No. 1).) Baldin first noticed the negative credit reporting in approximately May or June, 2012. (Baldin Dep. 56:22-25.) Following motion practice and numerous amendments, Baldin filed her Fourth Amended Complaint on July 3, 2014. The Fourth Amended Complaint contains a single claim for defamation.

On June 27, 2012, Baldin sought a temporary restraining order and preliminary injunction "from Wells Fargo's harmful and inaccurate reporting." (Baldin Decl. ¶ 10.) Although Judge Mosman granted an injunction on July 3, 2012, the parties disagreed on the interpretation of Judge Mosman's ruling and, consequently, the Injunction Order was not finalized until October 10, 2012. Since the time the October 10, 2012 Order was entered, Wells Fargo has twice violated the Injunction. (ECF No. 98; ECF No. 130.) In fact, on September 27, 2013, Judge Mosman entered an Order sanctioning the Bank for its continued violations. (Baldin Decl. ¶ 10; ECF No. 130.)

Late in 2012, Baldin was unable to obtain competitive financing to refinance the loan on the Multnomah Property. Consequently, she sought a buyer for the Multnomah Property in an attempt to capture at least some of her equity in that property. (Baldin Decl. ¶¶ 12, 13.) After locating a buyer, Baldin request a loan-payoff statement from Wells Fargo. According to Baldin, the Bank provided a statement that continued to include the escrow account balance, an inflated loan amount, and late fees. (Baldin Decl. ¶ 12; Ex. 16.) Baldin's prospective buyer declined to pay the increased price of the Multnomah Property due to the "Bank add-ons".

Baldin also asserts Wells Fargo "targeted" her with its tax reporting by misreporting Baldin's 2012 interest payments on the loan for the Multnomah Property. (Baldin Decl. ¶ 15; Exs. 18, 19.) According to Baldin, she made four payments on that loan, yet Wells Fargo reported only three of them to the Internal Revenue Service ("IRS"). This resulted in Baldin seeking an extension for the filing of her income taxes and further damaging her "financial reputation." (Baldin Decl. ¶ 15.)

Additionally, in 2013, Baldin states Wells Fargo changed the tax reporting for a home equity line of credit on the Miami Property. (Baldin Decl. ¶ 16.) The original loan on that Property was a $56,500 home equity line of credit, with Schoeffner as the primary borrower and Baldin as the co-borrower. In the past, Wells Fargo reported the mortgage interest payments to the IRS under Schoeffner's social security number. In 2013, however, the Bank wrote-off that loan. (Baldin Decl. ¶ 16.) Baldin opines the write-off was for Wells Fargo's financial gain and to facilitate its sale to another buyer. (Baldin Decl. ¶ 16.) Moreover, the Bank reported to the CRAs the loan had been modified pursuant to a loan modification agreement. Baldin contends no loan modification was ever agreed upon and the reporting "further casts aspersions on Baldin's perceived financial ability." (Baldin Decl. ¶ 16.)

Following this write-off and sale (but not modification), Wells Fargo addressed the IRS Form 1099 statement to Baldin using only her social security number. (Baldin Decl. ¶ 16.) Baldin concludes "this is a malicious act where the Bank is trying to create additional financial liabilities for her." (Baldin Decl. ¶16.)

### Legal Standard

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED R. CIV. P. 56(a). The

party seeking summary judgment bears the initial burden of demonstrating no genuine dispute of

material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). All material facts are

resolved in a light most favorable to the nonmoving party. *Id.* at 331. The court must accept all

evidence and make all inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 255 (1986).

*Discussion*

I.    Defamation

Wells Fargo contends summary judgment against Baldin's defamation claim is appropriate

on multiple grounds. (Defs.' Mem. Summ. J. 10.) First, Wells Fargo maintains the reporting was

"true" as Baldin admits she stopped making payments on the loans prior to Wells Fargo initiating

any negative reporting. Next, the Bank contends the Fair Credit Reporting Act ("FCRA") preempts

"any defamation-type claims" related to credit reporting activities because Baldin cannot show

"malice" or "willful intent" as required to avoid preemption. Finally, in any event, Wells Fargo

insists Baldin is unable to show damages suffered as a result of Wells Fargo's credit reporting. As

explained below, the Court finds Wells Fargo's credit reporting was accurate and, consequently,

summary judgment should be granted on Baldin's claim for defamation.

A.    *FCRA Preemption*

As a preliminary matter, Wells Fargo contends FCRA, 15 U.S.C. §§ 1681-1681x, preempts

Baldin's defamation claim because she cannot establish evidence of malice or willful intent by Wells

Fargo to cause her injury. The FCRA contains two preemption provisions: 15 U.S.C. §

1681t(b)(1)(F) and 15 U.S.C. § 1681h(e). Section 1681t, titled "Relation to State Laws," provides,

in relevant part, that "[n]o requirement or prohibition may be imposed under the laws of any State

. . . with respect to any subject matter regulated under . . . section 1681s–2 of this title, relating to

the responsibilities of persons who furnish information to consumer reporting agencies . . . ." 15

U.S.C. § 1681t(b)(l)(F). Section 1681h(e) provides as follows:

> Except as provided in sections 1681n and 1681o of this title, no consumer may bring
> any action or proceeding in the nature of defamation, invasion of privacy, or
> negligence with respect to the reporting of information against any consumer
> reporting agency, any user of information, or any person who furnishes information
> to a consumer reporting agency, based on information disclosed pursuant to section
> 1681g, 1681h, or 1681m of this title, or based on information disclosed by a user of
> a consumer report to or for a consumer against whom the user has taken adverse
> action, based in whole or in part on the report . . . except as to false information
> furnished with malice or willful intent to injure such consumer.

15 U.S.C. § 1681h(e).

Because Congress did not repeal or alter § 1681h(e) in 1996 when it added § 1681t(b)(1)(F),

there is a tension between these two provisions that has not yet been resolved by the Ninth Circuit.

*Weseman v. Wells Fargo Home Mortgage, Inc.*, No. 06-cv-1338-ST, 2008 WL 542961, at *3 (D. Or.

Feb. 22, 2008). As noted in *Weseman*, if § 1681t(b)(1)(F) is construed to preempt all state law

causes of action against credit information furnishers, whether statutory or common law, then §

1681h(e), which allows state law claims when plaintiff alleges malice or willful intent to injure, is

superfluous and effectively repealed. *Id.*

The majority of district courts in the Ninth Circuit, as well as Judge Brown in this district,

have adopted the "total preemption" approach, holding that § 1681t(b)(1)(F) precludes both statutory

and common law claims against furnishers of information. *See, e.g., Cope v. MBNA Am. Bank, NA*,

No. 04-cv-493-BR, 2006 WL 655742, at *9 (D. Or. March 8, 2006) ("Judge Brown first addressed

the question in 2006, finding that plaintiff's claim for defamation was barred by either preemption

provision."). As noted by Judge Stewart in *Weseman* the "total preemption" approach violates a

canon of statutory interpretation by allowing a general statute to trump a specific statute. *Weseman*, 2008 WL 5429561, at \*4. As such, Judge Stewart adopted a "statutory approach," under which § 1681t(b)(1)(F) preempts only state law claims brought under state statutes, with § 1681h(e) applying to and preempting only state common law tort claims. *Id.*

In a prior decision, this Court found "the 'statutory' approach the correct reading of the Credit Act . . . ." *Decker v. GEMN Lending, Inc.*, No. 3:12-cv-632-AC, 2012 WL 5304144, at \* 8 (D. Or. Sept. 13, 2012.) Accordingly, Baldin's state common-law claim for defamation is governed by § 1681h(e) and is preempted by the FCRA unless there is evidence the false information was "furnished with malice or willful intent to injure" the consumer. A willful act under FCRA is an act "done knowingly or intentionally, or is recklessly committed with a conscious disregard for the rights of others." *Harris v. Equifax Credit Info. Serv.*, No. 01-cv-1728-JE, 2003 WL 23962280 at \*2-3 (D. Or. Nov. 24, 2003); *accord Severson v. Chase Manhattan Mortg. Co.*, No. 10-cv-3123-CL, 2011 WL 4443436, at \*5 (D. Or. Aug. 26, 2011).

Relying upon § 1681h(e) for its preemption argument here, Wells Fargo insists Baldin's defamation claim is preempted because there is "absolutely no evidence that Wells Fargo's credit reporting was conducted with any ill intent." (Defs.' Mem. Summ. J. 15.) According to the Bank, its credit reporting was accurate and pursuant to the loan agreements. Moreover, Wells Fargo asserts Baldin is unable to identify "any evidence whatsoever that Wells Fargo knew its credit reporting was inaccurate, or acted with reckless disregard as to its truth or falsity." (Defs.' Mem. Summ. J. 16.)

In Baldin's FAC, she states "Wells Fargo's continued inaccurate reporting of negative information to the credit reporting agencies, in defiance of an order from this Court enjoining and restraining the bank from doing so, *constitutes malice* towards [] Baldin." (Fourth Am. Compl. ¶

65 (emphasis added).)  In support of her defamation claim, Baldin offers the following conduct by

Wells Fargo:

> 1.  Wells Fargo has twice violated the Order entered by Judge Mosman enjoining the Bank "from reporting any information regarding the status of the loans secured by the properties located at 2410 NE Multnomah Street, Portland, Oregon and 288-294 Cervantes Circle, Lake Oswego, Oregon, to the national credit reporting agencies from the date of this Order through the pendency of this litigation, or until otherwise ordered by the Court."  (ECF No. 78.)  (Baldin Decl. ¶ 10.)
>
> 2.  "Wells Fargo targeted the Cervantes Property, an equity-rich property with a fully performing loan, for foreclosure based on a technicality under the Deed of Trust."  (Pl.'s Resp. 20.)
>
> 3.  The Bank was aware "the property taxes were paid erroneously yet it continued to maintain escrow accounts and then negatively report on loans it refused to accept payments."  (Pl.'s Resp. 20; Baldin Decl. ¶¶ 5 and 6.)
>
> 4.  Finally, Baldin points to Wells Fargo's "shady tax reporting strategy."  (Pl.'s Resp. 20; Baldin Decl. ¶¶ 15 and 16.)

Based upon these allegations and the evidence in support, Baldin argues a jury could find Wells

Fargo acted with malice or willful intent toward Baldin.

Turning first to Baldin's "evidence" of malice based upon Wells Fargo's violation(s) of the

injunction, a careful review of the relevant documents reveals Wells Fargo's first infraction was a

"technical violation" due to a mistake within the Credit Reporting Division of Wells Fargo.  Clearly,

such a violation does not constitute malice or willful intent.  The evidence presented in support of

the second violation shows Wells Fargo inadvertently coded Baldin's accounts to restrict credit

reporting through May 2013 only.  Once it learned of its error, Wells Fargo suppressed all credit

reports made on Baldin's accounts for June and July 2013, and placed "life of loan" credit stops on

her accounts to prevent future credit reporting until the current litigation is resolved.  There have

15 - FINDINGS AND RECOMMENDATION

been no subsequent violations.[4]  Based upon the evidence in the record, the Court concludes Wells Fargo's actions with respect to the Order entered by Judge Mosman do not constitute malice.

Next, the Court considers Baldin's "evidence" of Wells Fargo's "shady tax reporting strategy" to show malice in this case.  Presently, there is simply no credible evidence in the record that the Bank's conduct with respect to the tax reporting on Baldin's behalf was improper.  As such, these bare allegations cannot provide a ground to find a material fact in dispute with respect to malice or willful intent.

Solely for the purpose of permitting the Court to reach the merits of Baldin's defamation claim, the Court finds Wells Fargo's conduct in paying the taxes on the Multnomah Property after Baldin paid the amounts in full and notified the Bank of such payment, and its conduct in enforcing only one of the "due on sale" provisions, *i.e.*, the Cervantes Property, is sufficient to create an inference of malice.  Consequently, Baldin's claim for defamation is not preempted by the FCRA.

B.    *Truth as a Defense*

In her FAC Baldin alleges that despite "tendered timely mortgage payments of the Multnomah, Cervantes and Miami Properties," the Bank "inaccurately reported that [she] and her ex-husband were delinquent or had failed to make payments on these loans to the three national credit bureaus . . . thereby causing [her] to incur negative scrutiny without justification and without cause."  (Fourth Am. Compl. ¶ 52.)  Based upon these allegations, Baldin accuses Wells Fargo of defamatory credit reporting.  (Fourth Am. Compl. ¶¶ 62-68.)

---

[4]  Moreover, the effect of Wells Fargo's remedial actions was to remove the June and July credit reporting from Baldin's credit reports as if they had never been made; and second, the "life of the loan" credit stops were put in place to prevent the automatic expiration of the credit stops in the future.

"Under Oregon law, a claim for defamation has three elements: (1) the making of a defamatory statement; (2) publication of the defamatory material; and (3) a resulting special harm, unless the statement is defamatory *per se* and therefore gives rise to presumptive special harm." *Neumann v. Liles*, 261 Or. App. 567, 575 (2014) (quotations and citation omitted), *rev. allowed*, 356 Or. 516 (2014). Wells Fargo contends Baldin's defamation claim fails as a matter of law because the information it reported was true. *See Bahr v. Statesman Journal*, 51 Or. App. 177, 180 (1981) ("It is axiomatic that 'truth' is a complete defense in a defamation case.") Wells Fargo asserts "the evidence here, including Baldin's own admissions, demonstrates that Wells Fargo's credit reporting was accurate and contained no misstatements." (Defs.' Mem. Summ. J. 10.)

The three loans subject to Baldin's defamation claim are for the Cervantes, Miami, and Multnomah Properties. Thus, the Court will consider the evidence in support of Baldin's defamation claim and Wells Fargo's defense of "truth" on each of these properties to determine whether there are disputed issues of material fact that must be resolved by a jury.

> 1.   Cervantes Property

The parties do not dispute that the terms of the note and the trust deed on the Cervantes Property prohibited any sale or transfer of the property without Wells Fargo's prior consent. (Kruse Decl. Ex. 3, at 3; Ex. 4, at 11.) Further, there is no dispute Baldin authorized the transfer of the Cervantes Property to the LUGANO PROPERTIES 4, LLC. (Baldin Dep. 130:19-131:1.) Pursuant to the transfer, Wells Fargo elected to exercise the due-on-sale clause, accelerated the loan, and notified Baldin of its election. (Kruse Decl. ¶ 18; FAC ¶ 29.)

It is also undisputed that Baldin was approximately ten months late in making her property tax payment on the Cervantes Property as the first installment was due in November 2010. Under

17 - FINDINGS AND RECOMMENDATION

the terms of the loan agreement on that Property, Baldin agreed to pay "when due" the Escrow items, including "taxes and assessments[.]" (Kruse Decl. Ex. 4 at 3-4.)  Initially, Wells Fargo waived Baldin's obligation to pay the Bank directly for Escrow Items and, instead, Baldin was required to make payments directly on the enumerated Escrow Items. Nevertheless, the Bank expressly reserved the right to pay an Escrow Item amount in the event Baldin failed to pay the amount due.  (Kruse Decl. Ex. 4 at 5.) Additionally, Baldin agreed "to repay to [Wells Fargo] any such amount." (Kruse Decl. Ex. 4 at 5.) Finally, pursuant to the express terms of Baldin's loan agreement with Wells Fargo, the Bank was entitled to "revoke the waiver as to any or all Escrow Items at any time" with proper notice, and "upon such revocation, [Baldin] shall pay to [Wells Fargo] all Funds, and in such amounts, that are then required . . . ." (Kruse Decl. Ex. 4 at 5.)

Following acceleration, Baldin made two monthly payments in February and March 2012, but her attempts were rejected and she did not attempt to make any more.  (Baldin Dep. 132:20-133:3.)  Wells Fargo insists the rejection of Baldin's payments was proper under the trust deed, which provides: "Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the loan current . . . ." (Kruse Decl. Ex. 4 at 4.)  The Bank maintains Baldin did not attempt to pay the balance of the loan or transfer the Cervantes Property back to her name. (Baldin Dep. 131:13-22.)  Because the balance of the loan on the Cervantes Property was not paid as required under the terms of the parties' agreement, Wells Fargo began reporting the loan delinquent to the CRAs in March 2012.  (Kruse Decl. ¶ 20.)

Baldin does not dispute that her payments on the loan for the Cervantes Property were not accepted after January 2012.  (Baldin Dep. 134:3-9; Baldin Dep. Ex. 37.)  The parties, however, diverge on the consequences of Wells Fargo's decision to not apply the payments and Baldin's

subsequent decision to cease making payments on the Cervantes Property after March 2012. Wells Fargo concludes the evidence shows "Baldin violated the terms of her loan agreement with Wells Fargo, then failed to cure her default, and did not pay the balance owed as required. Accordingly, Wells Fargo's credit reporting on the Cervantes Property is accurate, truthful, and is not a defamatory statement." (Defs.' Mem. Summ. J. 12.) Alternatively, Baldin maintains she stopped making payments because it was pointless and there was no way for her to "reinstate" the loan. Baldin testified she planned to refinance the property after Wells Fargo called the note owing, but Baldin was unable to do so because of the negative credit report initiated by the Bank. (Baldin Dep. 132:20-134:2.)

As outlined above, each step taken by Wells Fargo was in accordance with the loan agreement for the Cervantes Property. Baldin's transfer of the Property and subsequent failure to pay the property taxes on the Cervantes Property triggered certain obligations under her loan agreement, including the duty to pay the balance owed on the loan, and to pay for the Escrow Items. Baldin's decision to pay only the monthly principal and interest amount, and ignore the financial consequences of her choices, does not create liability for Wells Fargo.[5] Baldin made two monthly payments that were insufficient to bring the loan current under the terms of the due-on-sale clause. In that circumstance, the parties' agreement authorized Wells Fargo to "return any payment or partial payment . . . ." (Kruse Decl. Ex. 4 at 4.) Baldin elected not to pay the loan balance, or otherwise cure her default on that loan. In its reporting to the CRAs, Wells Fargo included a statement that the account information was disputed by Baldin. (Baldin Decl. Ex. 15 at 9.) Accordingly, in March

---

[5] The Court previously determined the transfer of the Cervantes Property triggered the due-on-sale clause. Wells Fargo was permitted under the terms of the parties' agreement to accelerate the loan and exercise the due-on-sale clause in the trust deed.

19 - FINDINGS AND RECOMMENDATION

2012, Wells Fargo reported the Cervantes Property loan was thirty days past due. That report was true and, therefore, cannot be the basis of a defamation claim.

### 2. Miami Property

As explained above, an escrow account was established for the Miami Property in January 2012. The establishment of the escrow account resulted in a higher monthly payment on that loan, either an additional $390/month or $718/month depending upon the option Baldin elected to repay the "escrow account shortage." (Kruse Decl. Ex. 18 at 1.) Baldin, however, opted to ignore the new higher monthly payment amount and continue to pay the amount owed prior to the establishment of the escrow accounts. Baldin made three "partial" payments in January and February 2012. (Kruse Decl. ¶ 30.) Baldin made two payments (in sums less than were required) and paid additional funds to Wells Fargo later in February when she was informed by a Wells Fargo teller that additional sums were owed. (Baldin Dep. 154:6-157:2.) After that time, however, Baldin does not recall making any additional payments. (Baldin Dep. 166:11-14, 169:20-23.) There is no evidence payments were made on the Miami Property after Baldin's "partial" payment in February 2012. (Kruse Decl. ¶ 30.) Wells Fargo began reporting the Miami Property as delinquent to the CRAs in April 2012. (Kruse ¶ 31.)

There is no dispute Baldin did not pay the taxes on the Miami Property when due. Nor does Baldin offer any evidence she paid the taxes on the Miami Property and provided timely notice to Wells Fargo. By sending letters in July and August of 2011, the Bank provided Baldin opportunities to cure her delinquency. Baldin claims she never received these letters, but this claim does not defeat summary judgment. First, Baldin is unable to show Wells Fargo was obligated to notify her and/or give her an opportunity to cure her tax default prior to stepping to pay the taxes on her behalf. Also,

under the common-law Mailbox Rule, "proper and timely mailing of a document raises a rebuttable presumption that it is received by the addressee." *Anderson v. United States*, 966 F.2d 487, 491 (9th Cir. 1992); *see also Meckel v. Continental Resources Co.*, 758 F.2d 811, 817 (2d Cir. 1985) (properly mailed computer-generated notices can be presumed received). Baldin does not contend the notices were not mailed to the correct address or where otherwise deficient in some regard, she simply states she did not see them.

Under the terms of the parties' loan agreement, Wells Fargo was authorized to take the actions outlined here. Baldin did not make any payments on the Miami Property after February 2012. In April 2012, Wells Fargo began reporting the payments for loan on that Property were delinquent. In its reporting to the CRAs, Wells Fargo included a statement that the account information was disputed by Baldin. (Baldin Decl. Ex. 15 at 8.) That report was true and, therefore, cannot be the basis of a defamation claim.

3.    Multnomah Property

Baldin presents evidence that she paid the taxes on the Multnomah Property *and* immediately notified Wells Fargo of the payment, prior to the Bank paying the taxes and creating the escrow account. As a result, Baldin contacted Wells Fargo and requested it disband the escrow account. When Wells Fargo declined to do so, she protested Wells Fargo's decision to escrow her loans by declining to pay the additional amount due each month and, concurrently, filed this action. (Baldin Dep. 105:14-106:19.)

As explained above, the trust deed for the Multnomah Property required Baldin to pay Escrow Items "directly, when and where payable" to the appropriate recipient, and further required Baldin to "furnish to Lender receipts evidencing such payment within such time period as Lender

21 - FINDINGS AND RECOMMENDATION

may require." (Kruse Decl. Ex. 2 at 5.) If Baldin failed to comply with these covenants, Wells Fargo could advance payments on her behalf, revoke the escrow waiver, and require Baldin to begin making monthly escrow payments. (Kruse Decl. Ex. 2 at 5.) Based upon these provisions, Wells Fargo established an escrow account for Baldin "as a direct result of her failure to pay property taxes when due, further compounded by her failure to respond to Wells Fargo's multiple requests for proof of payment in a timely manner." (Defs.' Mem. Summ. J. 13 (citing Kruse Decl. Ex. 9, 11.).)

The uncontroverted evidence is that Baldin's first tax installment on the Multnomah Property taxes was due on November 2010, and it was not paid until at least September 2011. In the intervening time, the Bank was notified by the Multnomah County Assessor that the property taxes for the Multnomah Property had not been paid when due and were considered delinquent. In response, Wells Fargo issued two rounds of letters to Baldin, approximately thirty days apart, to allow Baldin an opportunity to provide proof of the tax payment in one of three ways: (1) a copy of the cancelled check (front and back) used to pay the taxes; (2) a copy of the tax receipt showing payment; or (3) an official notice from the taxing authority showing the taxes were current. (Kruse Decl. Exs. 5-8.) By August 30, 2011, at least nine months after the taxes were initially owed, Wells Fargo had not received verification from Baldin that the delinquent taxes for the Multnomah Property had been paid. At that point, the Bank "established escrow accounts for . . . the Multnomah Property . . . and advanced funds to Multnomah County for the payment of the delinquent property taxes." (Kruse Decl. ¶ 12.)

Following the Bank's payment of the taxes on the Multnomah Property and the creation of the escrow account on that Property, Baldin was notified about the increase in her monthly payment amount on that loan. Effective December 2011, Baldin was required to make increased monthly

payments each month, either an additional $400/month or $1350/month depending upon the option Baldin elected to repay the "escrow account shortage." (Kruse Decl. ¶¶ 13-14; Exs. 9, 11.) Nevertheless, after the escrow account was established for the Multnomah Property, only payments in the amount of the principal and interest were made from December 2011 through April 2012, even though payment in a greater amount was owed. (Kruse Decl. ¶ 15.)

Baldin failed to tender monthly payments sufficient to make a complete payment, and Wells Fargo was entitled to accept the funds, but was not required to apply them. Specifically, the trust deed provides: "Lender may accept any payment or partial payment insufficient to bring the loan current . . . but Lender is not obligated to apply such payments at the time such payments are accepted." (Kruse Decl. Ex. 2 at 4.) Furthermore, the trust deed states: "Lender may hold such unapplied funds until Borrower makes payment to bring the loan current." (Kruse Decl. Ex. 2 at 4.) Baldin never brought the loan current. Wells Fargo was permitted to take these actions under the terms of the loan agreement. (Kruse Decl. Ex. 2 at 4-5.)

After it was discovered that both Baldin and Wells Fargo paid the property taxes on the Multnomah Property, Wells Fargo declined to disband the escrow account for any of Baldin's properties (Baldin Dep. 245:10-16.) Baldin does not identify any provision in the loan documents or elsewhere creating an obligation for Wells Fargo to disband the escrow account at her request. Wells Fargo defends the creating and maintaining of the escrow account on the ground Baldin did not provide proof of payment until at least October 2011, well after it established the escrow accounts and advanced funds to pay the delinquent taxes.

Wells Fargo presents evidence to show that payments in the amount of $1,999.09 were made on the Multnomah Property from December 2011 through April 2012. After April 2012, Baldin

23 - FINDINGS AND RECOMMENDATION

ceased making payments on the Multnomah Property and, consequently, in May 2012, Wells Fargo reported the loan as late. In its reporting to the CRAs, Wells Fargo included a statement that the account information was disputed by Baldin. (Baldin Decl. Ex. 15 at 9.)

As set forth above, all of the statements by Wells Fargo to the CRAs and challenged by Baldin as defamatory were true. Truth is an absolute defense to a claim for defamation. Consequently, Wells Fargo's request for an entry of judgment on Baldin's claim for defamation should be granted.

II.     Costs and Expenses

The Bank's request for its costs and expenses, including attorneys' fees incurred in defending against Baldin's claims, is premature and should be denied with leave to renew its request. By granting the Bank leave to replead its claim for costs and expenses, the Court does not suggest Wells Fargo is entitled to such an award under the terms of its agreements with Baldin. Rather, the Court decides only that such a request is premature at this juncture.

### Recommendation

Based upon the foregoing, Wells Fargo's Motion for Summary Judgment (ECF No. 186) should be GRANTED.

### Scheduling Order

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due **August 7, 2015**. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

24 - FINDINGS AND RECOMMENDATION

If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

DATED this 22nd day of July 2015

John V. Acosta
United States Magistrate Judge

25 - FINDINGS AND RECOMMENDATION